### THE STATE *against* JAMES GUILD.

A verbal confession of guilt, made by a person accused of a crime, if induced by a delusive hope of impunity excited in his mind, will not be received in evidence; and a written examination of the accused made by a justice within a few hours after the verbal confession, will also be inadmissible upon the presumption that the same inducement which operated upon his mind at the time he made the verbal confession, might have continued to operate, at the time of the written examination.

When once a confession under influence is obtained, a presumption arises that a subsequent confession of the same nature flows from the like influence, and such presumption ought to be overcome before the confession can be given in evidence.

Although an original confession may have been obtained by improper means, subsequent confessions of the same, or of like facts, may be admitted, if the court believe, from the length of time intervening, from proper warning, or from other circumstances, that the delusive hopes or fears, under the influence of which the original confession was obtained, were entirely dispelled.

A prisoner may be convicted on his own confession, when proved by legal testimony, although it is uncorroborated by any other evidence, provided the *corpus delicti* be proved.

Corroborating circumstances, used in reference to a confession, are such as serve to strengthen it, to render it more probable, such in short, as may serve to impress a jury with a belief of its truth.

A boy of the age of twelve years and five months, may be convicted on his own confessions, of the crime of murder, and executed. The capacity to commit a crime necessarily supposes the capacity to confess it.

This case came on to be tried at the Hunterdon Oyer and Terminer, holden at Flemington, on Friday, the 9th day of May, 1828.

*Wm. Halsted, Jr.*, counsel for the State.

*Messrs. Scott, Saxton, Clark* and *Prall*, counsel for the prisoner.

The jury having been sworn and affirmed, the prosecutor introduced his evidence, by which it appeared :

That Catharine Beakes, on the 24th day of September, 1827, resided in the township of Hopewell, in the county of Hunterdon, in a small house situate on the side of a public road. She was upwards of sixty years of age, and in good health ; her family consisted of herself, her son, (Jonathan Vankirk,) and a grandson, a little more than ten years of age. At noon her son went to work for a Mr. Titus, in the neighborhood, and her grandson went to school, and she was left alone in the house.

The prisoner was a colored boy, born on the eleventh day of April, 1815, the servant of one Joshua Bunn, who was the nearest neighbor to the deceased, his house being situate one or two hundred yards distant, towards Pennington, and on the opposite side of the road. There was a cornfield immediately across the road opposite the house of the deceased, in which the prisoner was that afternoon engaged, alone, in cutting up corn.

About half-past two o'clock, Charles F. M'Coy, with his team and boy, was passing that way, and before he got to the house, saw the prisoner about twenty yards from the road, under an apple tree in the same field where he had been at work. He hallooed to witness, or his boy, and appeared in a good humor. He was hacking the tree with a corn knife. Having some errand at the house, witness stopped his team opposite, went to the door, and knocked ;

nobody answered. Witness concluded he could do his errand on his return, and left the door. As he was going away he heard a noise something like the moving of a chair. He proceeded however on his way, and returned about five o'clock; near the door he met the little boy coming home; asked him if nobody was at home? he said his grandmother was. He stepped into the door and flew back. Witness entered, and saw her. She lay in the corner of the fire place, her head near the back, but did not touch it. "I told the boy to run to Joshua Bunn's. I raised her and set her against my knees. I, at first, thought she had had a fit, and fell and bruised herself. But she bled wonderfully. I put my finger on the top of her skull, and it appeared to be mashed in. I looked round and saw the yoke (a horse yoke) about four feet off. There was some blood on the yoke. The first person who came was Rachel Bostedo, an old woman. She asked me what was the matter. I told her I believed the old woman had been murdered. She did not come in. Mr. Vankirk and his son then came. Then Mrs. Bunn. She was yet alive. I saw no motion of the body after I raised her up. There was a wound on the top of her head; one on the right temple; one on the right eye; and one on the under jaw. I do not suppose these bruises could have been made by falling. It appeared she had been at work, as a cap lay on the hearth by the side of her."

Doctor Springer testified, that he was passing by about dark, went in and found her lying on the floor; her hair clotted; her breast covered with blood, which was still flowing; her head dreadfully mangled; the scalp loose and cut through; a large bruise on the right side of the head; the under jaw broken. The wounds were sufficient to produce death; and so great was the quantity of blood she lost, witness had no doubt her death was produced by the wounds he examined. He should not have known her she was so disfigured. A blow with the yoke by a boy might produce death. The wounds could have been produced by that stick. Witness is a physician, &c.

On the same evening a coroner's inquest was held over the body. A constable went for the prisoner and he was brought up. He was asked if he knew anything how the old lady came to her death. He denied knowing. He was twice asked.

Daniel Cook, Esq., testified that "the next day, about one o'clock, I met some persons, who told me they had got the murderer; that he had made confession. I found him at Mrs. Beakes. I had him put into my wagon. I did not hold out any promise or threat; nor did any other person to my knowledge. It was about half a mile to Davis' tavern. On the way, I asked him, Jim, did you kill the old lady? yes, said he, I did. Why did you not tell me this last night? He said, I was afraid. I got to Davis', and sat down. I then told him I wanted him to tell me what he had done; to tell the truth and the whole truth. I took his examination in writing." Here the examination was offered, when Mr. Scott, a counsel for the prisoner, rose and stated that there had been previous threats or promises to the prisoner, and to establish that fact, called

Joseph Davis, sworn: "On the morning of the 25th of September, Joshua Bunnell requested me to go down to the house of Mrs. Beakes. We went down and found several people there. The boy was describing some person that came out of the Stony Brook road. They went in pursuit of the person. I remained and took my seat on the piazza in front. I observed the boy opposite cutting up corn. Hearing that suspicion had risen against him, I watched his motions. His manner of working excited suspicion in me. I had my eye on him. He did not seem to mind his business. Frequently looked towards the house. Some person requested me to go home. The people brought back a man of the name of Peter Tucker. Afterwards I went back to the house. I saw a man talking with James (the prisoner) in sight of the house, in Mr. Bunn's cornfield. I think it was Andrew Titus. I went to them. I told the prisoner

that I believed he was guilty of the murder of that woman. He said he was not; looked down as he spoke. I told him that I understood that some person had seen him about the house that afternoon. I then asked him what was to be done about it? He made no answer that I recollect. I then asked him, whether he would not run away, since it appeared that he was guilty? He said yes, he would go right off. I told him he had better not, it was not a proper time of day for him to run away. He had better postpone it until night. He then said, he did not know where to go to. I told him if he would call on me that evening, I could tell him something about it. As he appeared at the time to be under a deep concern, I asked him if he could help himself if he did run away? He said he could not, he had no money. I then told him if he called on me that evening, I could help him to a quarter of a dollar or two. He said he would. I related to the people at the house the above conversation. They then went and brought him to the house. Charles M'Coy, Andrew Titus, Abraham Schenck and others. When they came to the door, he was told by some of the company, that if he was guilty of this murder he had better confess it, for as he could not retain it long, he might as well confess it first as last. He denied committing the murder. I told him if he was not guilty, not to own it, but if he was guilty he had better confess it. He then said that he done it. I believe I told him that it was a pity such a fine boy should be hanged."

Cross-examined: "I expressly told him that if he was not guilty he should not confess it. They found some blood on his clothes, and asked him where that came from. He said he must have got it from killing a sheep."

The counsel for the prisoner asked the witness "whether it was not his opinion that the prisoner's confession arose from the hopes or fears excited in his mind by the conversations and other circumstances of that occasion?" Objected to, and overruled by the court.

Charles M'Coy sworn: "After Davis had talked to the boy, Joseph Rue and I went after him. He started to run, I catched him. He asked me what we were going to do with him. I told him we were going to take him over to the house. I told him I was going to make him put his hand on her; that I had heard, if a person had murdered another, make him put his hand on her, and she will bleed afresh. He said I am not going there. I took hold of him to lead him along. Abram Schenck took hold of him the other side, and led him along. He began to cry. After getting into the yard, it struck me to examine and see if there was any blood. I told him to pull off his coat. We found on his waistcoat two specks of blood. He said they had been killing a sheep a day or two before, and he had got the blood then. I asked him to go in the house. He said he was not going. I said, Jim, if you have done this act you had better confess it. He hung his head, and after a while he said he had done it. Some of the company stepped up and said, did he say he had done it? Jim said no. I then told him, Jim, you say you have done·it; you had better confess it; and if you have, just tell us now what you done it for. After discovering the blood he seemed more confused. I did tell him if had not done it not to confess it, but if he had, he had better tell the whole truth. I am not certain, but I think Mr. Rittenhouse told him that if he would confess he would probably get clear. This was before the blood was discovered, and before the confession of the fact. This was ten o'clock next day. He soon after went with Esq. Cook to Mr. Davis'. I have lived in the neighborhood within about a mile and a half of Mr. Bunn's; have had frequent opportunities of conversing with the boy. He has as much sagacity as any boy I know of his age; was always accounted a smart, cunning, mischievous kind of boy."

D. Cook, Esq. The night before, and next day particularly, I told him to tell nothing but the truth. Before

taking his examination, I asked him if he knew any thing about the nature of an oath. He said he did not. I told him he must tell nothing but the truth; if he did, when he come to die, he would go to punishment. He said he knew that well enough. He has a great deal of understanding; as much as any black boy I am acquainted with."

Joseph Davis. " He is reputed a cunning smart boy."

Jonathan Vankirk. " He is accounted smarter than common black boys of his age; full of mischief; think him a cunning boy; ingenious to get out of a scrape."

The court excluded the written examination; and overruled the preceding confessions.

The court adjourned until Saturday morning, 9 o'clock; at which time the court was opened.

Mr. Halsted offered to prove confessions made by the prisoner to various persons, five months after the first; after counsel had been assigned him; and after he had been cautioned not to expect favor, &c.; and proved by Esquire Cook, that on Saturday morning of the October term, he told Jim (the defendant) that he must expect death and prepare to meet it; his countenance changed, but he made no answer.

Esquire Thompson. " And by the next day after he came to gaol, he confessed the facts, and that witness told him he must abide the consequence, and could not expect to escape."

The confessions were objected to, being the same in substance with the first. The objection was overruled, and the confessions permitted to be given in evidence.

Eli Herbert sworn. " In February term I had some conversation with him. Took in several people. He said he went there (house of deceased,) to borrow a gun, and the old bitch would not lend it to him. He said as he was going out of the door, he saw the yoke by the door. He picked it up and went back. He did not know whether she saw him or not. He struck her. She did not fall. He struck her again, and she fell. He then went toward the

door, and then he thought if she got well, she would tell his mistress, and his mistress would thrash him. He then went back to kill her, and did kill her."

Similar confessions were proved by Henry Gulick, Ralph Stevenson, Ralph Knowles, S. G. Opdyke, Esq., Charles Bonnell, Esq., Thomas J. Stout, and others; made at various times, as late as the month of February, and with more or less particularity. To Henry Gulick he said that "she made him mad; accused him of things not true. She accused him of killing fowls or chickens, and letting out pigeons." To S. G. Opdyke, Esq., he said, "he did not intend to kill her in the first place. The first blow did not knock her exactly down. He thought he would give her another. He then said he gave her the third blow with the intent to kill her. The deceased was sitting by the fire blowing the fire. Struck her back of the head. Come up behind her." To Ralph Knowles he said, "he had killed the woman and was sorry for it. He went there to get a gun belonging to Jonathan Vankirk, and Mrs. Beakes refused to let him have it. She asked him why she should let him have the gun, as he had let out her pig and pigeons. He said, she was saucy. She was starching a cap, and stooping down on the hearth. He struck her. The second blow she fell. He then desisted; but he thought if she told of him he should get a terrible flogging, and then he concluded he would kill her, and she would not tell of it. He struck her a third, and, I believe, a fourth time."

Charles Bonnel, Esq., sworn. "I had been in the habit of going to the prison very often, and when I went the boys would be running in and asking him questions. In September last, I had cautioned James not to be making these acknowledgments to the boys as they were talking to him. He was told by the boys he would be hung, and all that. He said he did not care a damn, he would swear at the boys. In February last he said he had killed her. Said he

had killed the damned old bitch with the end of the yoke.· Said he went to borrow a gun, and she would not lend it," &c.

Cross-examined. "He appeared to have considerable wit, but wanted discretion and good sense. Seemed to be irritated by others, and that was the cause of much of his bad conversation. I thought there was too much talking to him. Kept growing worse. Had devil enough in him when he came there."

Thomas J. Stout, sworn. "The week before February court, he was talking about it, in a loose manner, as he generally did. When asked if he thought the case would terminate against him in court, he said he did not care a damn. Would often rip out something against the boys passing. He appeared acute in many things, but did not appear to realize his situation. Never appeared cast down; always cheery. Appeared a little more deliberate when telling the circumstances of the old lady's death than on other occasions."

Cross-examined. "He did not appear to realize his case as a discreet or rational person would."

J. J. Young, Esq., sworn. "At the time of the burning of the court house, I had considerable conversation with the boy. I thought him full as acute as boys in common. His memory seemed to be correct."

Jonathan Vankirk, called again. "I had borrowed a gun and had it in the house some time. The boy knew I had it. I had a pigeon in the crib. We had a shoat that got hurt, and the deceased thought that the defendant run over it with a horse, as I heard her say. When I went out of the house the yoke was by the side of the door."

Witnesses for defendant :—

Stephen Albro, sworn. I came to the gaol about the middle of November. The boy was a prisoner there. I heard his conversation, and observed his manners until he was removed to Somerville. Heard him express himself in

respectful terms of his master's family. Never heard any ill-will expressed towards his mistress. He would answer in an impudent way when interrogated. I have seen many boys of his age having a greater share of understanding than he. I do not think he had hardly an ordinary share of it. He appeared to have a smartness of turn when talked to. I have never thought him deep. He had intelligence enough to know when he did wrong, but was wanting in discretion, and could not fully appreciate the consequences of crime. He was often teased and would answer smartly, and insolently."

Cross-examined. "He has capacity enough to distinguish between right and wrong; but I do not think he considers or reflects as much as some. I think there are usually too many visitors to such prisoners. I heard some person ask how he came to kill that woman? He said because she made him mad. I think his bad actions proceed more from passion than from malice."

Joshua Bunn, sworn. "A day or two before the murder was committed, James assisted in killing a sheep. I have endeavored to give him good instruction, and in some respects he knows the difference between good and evil. He has some idea of the consequences of evil as respects another world; attended family prayers; often had religious worship at my house; once a month. Should have sent him to Sunday school, but was afraid it would do more hurt than good, he was so inconsiderate and mischievous. He is passionate, mischievous, insolent, but does not bear malice."

The cause was summed up by Mr. Saxton and Mr. Clark on the part of the prisoner, and by Mr. Halsted in behalf of the state.

CHARGE. *Gentlemen of the Jury.*

James Guild is indicted for the murder of Catharine Beakes, at the township of Hopewell, on the 24th day of September, 1827.

That a woman by the name of Catharine Beakes, at her house in the township of Hopewell, came to her death on the 24th day of September, 1827, is proved beyond controversy ; and upon recalling to your minds the evidence of the witnesses, and especially of the physician, respecting the marks of violence visible about her head, I think you cannot have a moment's hesitation in believing that her death arose from severe blows inflicted by some hand not her own ; and by striking with the yoke, produced in court (which was found near her) or with a club, or some similar instrument of aggression ; and if you consider her death proved to have arisen from a blow or blows with this yoke, or a club, or any weapon of the like kind, the indictment is supported in this respect.

The next and great question which arises is, who is the murderer ? or rather, is the prisoner at the bar the individual who has committed this heinous offence against the laws of God and man ?

The evidence, to fix it upon this defendant, is, in the first place—

The circumstances attending this transaction. These, as affecting the prisoner, are none of them very important. The principal are :

1. He was near the scene working in a field.

2. He was unwilling to go in and see her when told it might prove his guilt.

3. He had some spots of blood on his jacket.

With respect to the last of these, you will recollect the cause to which he ascribed it, and in which he is confirmed by the testimony of his master, Joshua Bunn ; and as to his unwillingness to touch the corpse, a child of his years might naturally have felt all the aversion to it which he manifested, placed in the same circumstances, without any consciousness of guilt.

There are, besides these, some coincidences between the facts detailed in his confessions, and the real state of things as

testified by other witnesses. These would be strong proofs of guilt, if he could not have learned them from any other means, except by having gone to the house and seen the body, and other things, as they really were. But his confessions were made long after. There were other sources of information, and if you think it probable or possible that it was furnished from other sources, the evidence arising out of these coincidences will have but little weight.

2. The confessions of the prisoner himself:

Voluntary confessions, made understandingly, may prove crime. But confessions made under the influence of fear or hope, produced by threats or promises, are not ever admissible in evidence.

The first confessions offered in evidence were considered by the court to be liable to objection on these grounds, and were, therefore, overruled; and having been overruled, it is your duty to dismiss from your minds any knowledge you may have obtained of them, at least so far as they can operate against the prisoner.

Again. It is said that all subsequent admissions of the same or of like facts, should be overruled, because they may have proceeded from the same influence.

Confessions have been admitted before you by the court of the same, or of like facts, made afterwards (some months afterwards), and which, by the application of the above principle in its full extent, would have been rejected. These latter confessions were received, because the court deemed that although an original confession may have been obtained by improper means, subsequent confessions of the same or of like facts may be admitted, if the court believe, from the length of time intervening, from proper warning of the consequences of confession, or from other circumstances, that the delusive hopes or fears, under the influence of which the original confession was obtained, were entirely dispelled. Under this impression of the law, the court, with some hesitation, admitted the confessions; and having been

State *v.* Guild.

admitted, it is your business to consider them; and to consider them with reference to the manner in which the first confession was obtained; and if you are not satisfied that these latter confessions were made freely and understandingly, and wholly free from any expectation of benefit, raised by the hopes and promises preceding the first confession, or from his continuing to tell a uniform story, it is your duty to reject them from your minds, and not to make them the foundation of your verdict.

It will be necessary then to go back to the circumstances preceding the original confession. I shall briefly notice them. The prisoner was accused of the murder; he was told there was proof of it; that he was seen about the house; he was advised to run away; he was afterwards seized by two persons, and taken near to the house where the murder was committed; he was then told to take off his coat; blood was found on him, and considered by the bystanders as proof of his guilt; he was asked to go in and touch the body, under the superstitious idea suggested by the witnesses; "he was told he had better confess," that "if guilty he had better confess;" he was much pressed to confess, but at the same time told not to confess unless he was guilty; and a witness is pretty well satisfied that one of the bystanders told him " if he would confess he would probably get clear." Under all the agitation, fears and possible, if not probable, hopes, produced by these circumstances, he made his first confession, and, immediately after, the one before the magistrate. The court thought these first confessions, thus obtained, should be overruled.

You will next call to mind the circumstances calculated to remove this influence, if it existed, and make the subsequent confessions lawful. These latter confessions were made in February, 1828, some months after the first. But you will recollect that they were not made after an interval of silence, and under new circumstances, and in a new situation; but the boy was taken to gaol, and there was a con-

tinued series of conversations and confessions, without lapse of time or other favorable circumstance to bring him to reflection upon his awful situation, or the danger of these unguarded and thoughtless confessions.

With respect to the instructions of grave persons and magistrates; they were general; warning of his danger, to be sure, but not particularly calculated or directed to dispel his false hopes, if such existed, or to open to his mind, and impress upon it forcibly, all the consequences of his conduct. But the fact is with you. And if you are fully satisfied that these confessions were made freely and understandingly, and uninfluenced by the causes of the first confessions, you will then examine the confessions themselves.

They were made to several persons, and are so fully testified to, that there can be no doubt they were made.

But the defendant is an infant; at the time of the act, and confession, between twelve and thirteen years of age. This fact should make you more cautious in admitting the confessions, and induce you to resolve your *doubts* in his favor.

With respect to the ability of persons of his age, to commit crimes of this nature, the law is, that under the age of seven, they are deemed incapable of it. Between seven and fourteen, if there be no proof of capacity, arising out of the case, or by the testimony of witnesses, the presumption is in their favor; a presumption however growing weaker and more easily overcome, the nearer they approach to fourteen. And at the age of this defendant, sufficient capacity is generally possessed in our state of society, by children of ordinary understanding, and having the usual advantages of moral and religious instruction. You will call to mind the evidence on this subject; and if you are satisfied that he was able, in a good degree, to distinguish between right and wrong; to know the nature of the crime with which he is charged; and that it was *deserving* of *severe* punishment, his infancy will furnish no obstacle, on the score of incapacity, to his conviction.

If he be guilty of the crime, the next enquiry will be, is it the crime stated in the indictment, that is, the crime of murder?

Murder is defined by *Lord Coke* to be, " where a person of sound memory and discretion unlawfully killeth any reasonable creature in being, with malice aforethought, either express or implied." And it is defined by *Chief Justice Kirkpatrick* to be " the killing of a reasonable creature with malice aforethought."

And the law presumes all homicide to be committed with malice aforethought until the contrary appears from circumstances of alleviation, excuse, or justification. And it is incumbent on the prisoner to establish such circumstances unless they appear in the evidence produced against him. 2 *Halsted* 243. Manslaughter is the unlawful and felonious killing of another without any malice express or implied."

" If a man kill another suddenly, without any, or without *considerable provocation,* the law implies malice, and the homicide is *murder.*"

" If it be perpetrated with a deadly weapon, the provocation must be *great indeed,* to extenuate the offence to *manslaughter.*"

It is even laid down, " That *no words* or *questions* are sufficiently provoking to soften the crime to manslaughter, if it be perpetrated with a deadly weapon."

You will apply these principles to the case before you. You will recollect the slight nature of the provocation. And notwithstanding the eloquent appeal which has been made on this subject to the compassion of the court, I feel it my duty to say to you, that there is nothing in the provocation sufficient to soften the crime into that of manslaughter; but that, if guilty at all, the prisoner is guilty of the crime of murder.

Of this case, you are the constituted judges. I trust you will discharge your duty with caution, with humanity, and at the same time with firmness; with due attention to the

claims of mercy, and of justice, of the prisoner and of your country. And that if from the law and evidence you are fully satisfied of the defendant's guilt you will say so. But if you believe him innocent, or have any doubts, *even the slightest,* of his guilt, you will acquit him. And may he, who knows the truth, guide you to the proper result.

The jury after being out between two and three hours, returned a verdict of *guilty.* G. K. DRAKE.

After the verdict was rendered, Mr. *Scott,* on behalf of the prisoner, moved the court, that the judgment be deferred until the next term of the Oyer and Terminer, that an opportunity might be afforded in the meantime, to take the advisory opinion of the Supreme Court, upon several questions of law which had been discussed by the counsel, and decided by the court in the progress of the trial. This motion was acceded to by the court, and the foregoing state of the case was drawn up by *Justice Drake,* and submitted to the Supreme Court. At the September term, the case was argued by *Clark* and *Saxton* for the prisoner, and *W. Halsted* for the state.

The counsel for the prisoner contended:

I. That the confession made by the prisoner, to D. Cook, Esq., and the written examination taken before him were inadmissible, having been made so recently after the mind of the prisoner had been operated upon, by the inducements of hope and fear.

II. That the confessions made by the prisoner after he had been confined in gaol, and five months after the offence committed, ought also to be rejected, because it was to be presumed, that the same inducements which operated upon the mind of the prisoner to make the first confession, continued to influence his mind at the time of the subsequent confessions, and cited the case of *King* v. *White,* 2 *Starkie Evi.* 49, and *State* v. *Aaron,* 1 *South.* 240.

State *v.* Guild.

III. That if these confessions were competent evidence, that they were not sufficient to convict the prisoner, as they were only naked confessions uncorroborated by circumstances. 1 *South.* 240.

On the part of the state it was contended :

I. The confession made by defendant, to D. Cook, Esq., was admissible.

No threat was held out to him or promise of favor, but he was cautioned to tell the truth.

The fact of a person (having no authority) holding out an inducement, such as this case presents, is not sufficient to exclude the evidence. *Rex* v. *Gibbons*, 1 *Carr.* and *Payne*, 97 ; 11 *Eng. C. L. Rep.* 327 ; *Wil.* 343, *Rex* v. *Tyler*, 1 *Carr & Payne*, 129 ; *Carr. Cr. Law* 65 ; *Rev* v. *Rowe*, *Russel & Ryland*, *C. C. R.* 153 ; and 4 *Dall. Rep.* 116 ; *Commonwealth* v. *Dillon*, 2 *Stark. Evi.* 50, *note q.*

The observations of promises, if any, were all conditional. " If you are guilty you had better confess," &c., &c., differ from *Warickshall & Thompson's case, Leach.* 263–291.

II. If even that evidence was inadmissible, on account of its being made so soon after the inducement to confess was held out to him, yet that the circumstances and lapse of time which intervened were sufficient to efface any impression of hope of favor which might have been fixed upon his mind.

The case of *King* v. *White,* is cited to shew that all subsequent confessions ought to be rejected. This is a mere note of a manuscript case, and it is impossible to tell what were the circumstances of it ; and it has been overruled by later cases.

Whether the impressions on his mind were removed by the lapse of time, or the declarations of judges, Cook and Thompson, were properly left to the jury.

The competency of the last declarations, must rest upon the same footing as the first ; that is, whether they were induced by the expectation of favor, or fear of punishment.

And *Ch. Justice Kirkpatrick* in the case of Aaron says, if it rested upon that ground, he would have left it to the jury. 1 *South.* 240. *Justice Southard* also was of this opinion.

III. If these confessions were competent, were they sufficient to convict?

It is said they are not.

1. Because they are not corroborated by circumstances. They are mere naked confessions.

2. Because made by an infant.

1. These were not what are understood to be, mere naked confessions uncorroborated.

What is meant by a mere naked confession, such as has been said would not be sufficient to convict, is where even the *corpus delicti* is not proved, as the case referred to in note to 2 *Starkie, Evi.* 48 *note*, where the person supposed to be murdered was still living.

And this must be the case to which *Judge Rossell* refers, when he says no person can be convicted on his own confession, without a single fact to corroborate.

And if he means to apply his remark to cases, where the *corpus delicti* is proved by other testimony, the remark is not law. For it is well settled, at this day, that if a confession be voluntarily made, it is sufficient, if the jury believe it to be true, to convict the prisoner, without any corroborating circumstances to support it. *Wheeling's case, Leach Ca.* 311 *note ;* 2 *Hawk.* 595; *Tit. Evi. Book* 2, *Ch.* 46, *Sec.* 37; *Carr. Crim. Law* 64; *Russ. & Ry. C. C. R.* 440; *Phi. Evi.* 80. But in this case there were corroborating circumstances, viz.

The circumstance of his relating where the yoke was, viz. behind the door, which he could not have known if he had not been there. That he went to get a gun belonging to Jonathan Vankirk, who it is proved had a gun, &c.

IV. If a naked confession of this kind is sufficient to convict an adult, it is sufficient to convict defendant. See opinion of Southard. 1 *South.* 245-6.

The following opinion of the Supreme Court, drawn up by the Chief Justice, was communicated to the ensuing Court of Oyer and Terminer, in October, 1828:

The prisoner, James Guild, was, at the Oyer and Terminer for Hunterdon county, in May last, found guilty of the murder of Catharine Beakes. The court, at the instance of his counsel, humanely suspended the sentence of the law, in order that the opinion of the Supreme Court might be obtained, on some legal points which arose in the progress of the trial. These points were submitted to the court in the term of September, by the prisoner's counsel, with distinguished ability, and with the most laudable zeal, research and industry; and they have received from the court, the careful, anxious and mature examination, which their interest and importance, the situation of the prisoner, and the due administration of public justice, required.

The first question to be considered respects the admissibility of certain confessions of the prisoner which were received in evidence.

The deceased came to her death in the afternoon of the 24th day of September, 1827. An inquest over the body was held by the coroner, at her place of abode, in the evening of that day. The prisoner, who was known to have been at work alone in the same afternoon in a corn field on the opposite side of the road, was brought up by a constable, and, on being twice asked, denied that he knew any thing of the manner of her death. About ten o'clock on the next day, he made a verbal confession that he had killed the deceased, to Charles M'Coy and others, and shortly after, a similar confession to one of the justices of the peace of the county, by whom it was reduced into the form of a written

State *v.* Guild.

examination. The verbal confession and written examination, which took place within a short period of each other, were rejected by the court when offered in evidence, because induced, as the court believed, by delusive hopes of impunity excited, not by the justice, who appears to have acted with exemplary circumspection in the discharge of his duty, and without even a knowlege of the promises which had been made, but by other persons innocently misled by a common, and perhaps natural, but mistaken zeal to discover the perpetrator of a cruel and shocking outrage. The occasion does not call for an examination at large, of the propriety of the rejection of the proposed proof of these confessions. It is enough to say, that the rule of law by which the court was governed was sound, and there appears to have been enough of fact established, to warrant the court in applying the rule to the exclusion of the evidence.

Confessions were afterwards made by the prisoner, in February succeeding, nearly five months after the perpetration of the offence. These confessions were admitted in evidence. The counsel of the prisoner insist that the admission was illegal, because confessions of a like nature had been previously made under the influence of hope; and because these confessions *per se* and independent of the others were themselves made under the same delusive influence, and with an expectation that by perseverance in their narration, he should escape from punishment, and also, under the excitement of anger from reiterated taunts and accusations thrown out to him when in gaol.

The first of these grounds, the counsel of the prisoner sought to sustain by a reference to the recent and valuable treatise on evidence by *Starkie,* who says in part 4, page 49, title admissions, "where a confession has once been induced by such means [threats or promises], all subsequent admissions of the same or of the like facts must be rejected, for they may have resulted from the same influence." In examining the soundness of this doctrine, a shade of doubt

State *v.* Guild.

is at once thrown over it by the fact that no such rule of evidence is to be found either in the ancient reports or in the elder writers. Neither *Hale* nor *Hawkins,* nor *Gilbert* nor *Foster,* nor *Bacon* nor *Comyns,* state any such rule. It is first laid down, so far as my research extends, by *East.,* in the second volume of his pleas of the crown, page 658. He cites no case, refers to no authority, but says it is the common practice to reject such subsequent confession. *Starkie* refers only to a manuscript case of *Rex* v. *White* in Michælmas Term 1800; but, by whom decided, or in what court, or under what circumstances, he does not relate. It cannot - be expected therefore, that we should yield an implicit deference to this position without an examination of the principies on which it rests; and such an examination will shew it, as broadly and unqualifiedly stated, to be unsound and unworthy of confidence. The reason given for the rule by *Starkie,* is, that the subsequent admissions may have resulted from the antecedent influence. But in all sound logic, the question must turn, not on the possibility, but the presence of influence; not whether influence once existed, but, whether it continued to exert its force. By the rule, as stated by *Starkie,* the single enquiry would be, has a previous admission been made under improper influence? And if the answer be affirmative, the subsequent confession must be rejected, however thoroughly in the mean time the mind of the accused may be freed from such influence, and however perfectly truth and freedom of volition may have resumed their sway. Surely such a rule cannot prevail unless it be shewn that the human mind having once lapsed into falsehood, must, by a necessity of its nature persevere, without motive or inducement. For if it be true, and the assertion will receive on all hands a prompt and ready assent, that a man having, under given circumstances, made either a false or a true statement, may under other circumstances retract his allegations, and with equal assurance assert the converse of his previous declara-

tions; then it follows that the true criterion is, the actual state of mind of the accused, at the time the confessions were made, and the true question for solution, whether, at that time, he was under undue influence of hope or fear. It is readily admitted, that the antecedent hopes or fears, or other sources of influence are to be brought into account and weighed. It may even be conceded that when once a confession under influence is obtained, a presumption arises that a subsequent confession of the same nature, flows from the like influence, and that such presumption should be overcome before the confession ought to be given in evidence. But such presumption being satisfactorily repelled, the evidence ought to be received. The rule stated by *Starkie,* as it goes further, is erroneous. It makes the presumption a conclusive and impregnable bar, and, if understood in its broad terms, excludes the proof, whatever subsequent circumstances to remove the influence may have intervened.

From a careful examination of principles, then, we are prepared to yield a full acquiescence to the doctrine laid down by *Justice Drake,* on this occasion, in his charge to the jury in these words : " Although an original confession may have been obtained by improper means, subsequent confessions of the same or of like facts may be admitted, if the court believes from the length of time intervening, from proper warning of the consequences of confession, or from other circumstances, that the delusive hopes or fears under the influence of which the original confession was obtained, were entirely dispelled."

The rule of evidence seems to have been thus understood, and has certainly been so practiced in the criminal courts of this country. In *Williams' case,* 1 *City Hall Recorder* 149, the mayor (Radcliff) of New York, submitted to the jury to decide whether an examination in writing, taken in the police office had or had not been made under the influence of the threats which had preceded and induced a previous con-

fession to the prosecutor, and accordingly either to receive or reject the written confession.. In the case of *Bowerhan* and others, 4 *C. H. Rec.* 138, the mayor (Colden) said to the jury : It appears that in the first instance, an oral confession was made manifestly under the influence of a promise of favor, and subsequently an examination was taken in the police in the usual manner.   Here no threats or promises were made, nor does it necessarily follow that because the oral confession was made under the influence of promises, that the written examination stands in the same situation, but it will be for the jury to determine, from all the facts, whether the promises previously made continued their influence on the prisoner's mind at the time of the written examination; for, if so, then it is to be entirely rejected. The defendant who had made the confession, with some of the others, was found guilty.   In the case of *Mills* and others, 5 *C. H. Rec.* 178, the mayor (Colden) charged the jury in a similar manner.   In *Millegan* and *Welchman's case*, 6 *C. H. Rec.* 78, Mr. Recorder Riker, on an objection to evidence, recognized the same principle.

The true rule of evidence being thus shewn, we proceed to the second ground of objection raised by the prisoner's counsel, and enquire whether the court had reason to believe that the delusive hopes under which the original confession may have been obtained, were entirely dispelled ? Whether, when the confessions given in evidence were made the mind of the prisoner was laboring under or was freed from undue influence ?   These questions present pure inquiries of fact.   What in point of fact was the actual state of mind of the prisoner ?   We have seen that the Court of Oyer and Terminer acted under a correct view of the law, that they prosecuted their search into the facts on sound legal principles, and that they compared the facts before them with a correct legal standard.   Now the duty of this court when a reference like the present, is made to us by that tribunal, is chiefly to examine and revise matters of

law. So in England, when the advice of the twelve judges
is required. We cannot review a question of fact with those
advantages possessed by the court, before whom the wit-
nesses have appeared. To pass in judgment on the conclu-
sions of that court, we ought to stand, if not on superior, at
least on equal ground. Such a point of view may be
obtained in the examination of legal principles; but is
rarely accessible in the search of facts. Hence, on this
occasion, we might after an investigation of the legal doc-
trines desist, on this head, from further inquiry. But after
expressing, as we are bound to do, a just deference for the
determination of the court, we shall proceed to examine it
under such lights as the report of the case affords us.

A period of between four and five months elapsed between
the first confession and those which were afterwards made
by the prisoner and received in evidence against him. In
point of time, then the court may well have supposed there
was sufficient room for the first impressions to have subsided,
and for the gleams of hope by which at the outset he may
have been cheered, to have been dispelled. Soon after the
prisoner was brought to gaol, John Thompson, Esq., one of
the magistracy of the county, had an interview with him,
and told him he must abide the consequences of the act
which he had confessed, and that he could not hope to
escape. It is very probable the prisoner was not aware that
he who addressed him was a justice of the peace, yet he
could not fail to observe his age and his grave and vener-
able appearance so likely to excite attention to his remarks.
On Saturday morning succeeding the arraignment of the
prisoner, he was visited by Daniel Cook, Esq. With his
person and official character, he was doubtless acquainted,
for he was the same person before whom the examination
in writing of the prisoner had been taken. He told the
prisoner that he must expect death, and prepare to meet it;
and he mentions a striking fact serving to shew the effect
produced by the admonition. His countenance changed. His

mind received and was touched by the awful warning of
anticipated suffering. The delusion of hope was at the least
shaken. By Charles Bonnel, Esq., another magistrate, who
sometimes saw him in gaol, he was cautioned against making
acknowledgments to the boys as he was accustomed. If upon
his arrest, any delusive hopes induced his confession, the dis-
appointment which so soon succeeded would very naturally
have removed them. Instead of being better off, he saw his
condition become worse. Instead of being clear, he was
placed in gaol; he was indicted; publicly arraigned; and
assured by a respectable magistrate, that punishment would
certainly overtake him. Such a failure of ill-raised expecta-
tions would be apt to produce a revulsion of feeling. Con-
fession had done him no service; had produced no alteration
of his sufferings; had obscured instead of brightened his
prospects of escape and impunity. What motive then to
persevere in the avowal of his guilt? Such avowal had
availed him nothing; and what hope then could have
remained that any further confessions would be more bene-
ficial? Instead of realizing the anticipation of safety, he
found these confessions had brought him positive assurances
of a melancholy doom. When then, he persevered in making
these confessions, it is a most reasonable inference, that he
was actuated by some other motive than the undue influence
of previously conceived hopes of impunity. His counsel
said, on the argument before us, that having once made the
confession, it was natural for him to persevere in the same
tale. Such may be the result, if the confession were true.
But a steady adherence to falsehood, which he saw, produced
him no benefit, and was assured, would consign him to death,
cannot, it is believed, be reconciled with any ordinary prin-
ciples of human conduct.

The counsel of the prisoner further insisted, that the
taunts and reproaches to which he was repeatedly exposed
from idle boys, who came to the door or passed by the win-
dow of his gaol, tended to keep up in his mind, an excite-

ment unfavorable to the return of cool reflection. But the remarks made by him in any such moments of irritation, were not the confessions which were proposed as evidence on the part of the state, and whose admissibility are under consideration. And however he may have been led to reply harshly to remarks, equally harsh and thoughtless, to answer the fool according to his folly, it does by no means result, that the same temper would be felt towards the numerous, and some of them very respectable persons, with whom he conversed, and in a manner apparently serious and deliberate, related the melancholy tale. The idea that he saw in every person who approached him, an enemy, and therefore persevered in an avowal of the crime, is far more fanciful than just. Even a child would be prompted to silence in the presence of one whose hostility he knew or believed. If any thing escaped, the remarks would be few, even if harsh; but for such a person to avow a crime, to relate its most minute details, to expose himself thereby, as he was repeatedly assured, to imminent danger of the most severe punishment, and the whole story to be a total falsehood, is inconsistent with nature and repugnant to credibility.

Upon a careful view then, of the circumstances of the case, we find no reason to disapprove of the conclusion in point of fact, which was drawn by the court, or to doubt of the propriety of their determination, to submit these confessions to the consideration of the jury; and, the more especially, as the court gave to the prisoner the advantage of a review of these facts, by the jury, and expressly charged them, that "it was their business to consider the confessions with reference to the manner in which the first confession was obtained, and if they were not satisfied, that the latter confessions were made freely and understandingly, and wholly free from any expectation of benefit, raised by the hopes and promises preceding the first confession, or from his continuing to tell an uniform story, it was their duty to reject them from their minds, and not to make them the foundation of their verdict.

.It may not be without utility here to speak a word on a topic, briefly adverted to by the counsel at the bar, whether the admissibilty of confessions objected to as improperly obtained, should be decided exclusively by the court, or should be submitted to the jury, to consider the question of fact and to reject or weigh them accordingly. The practice of the courts of criminal judicature on this head has not been altogether uniform. *Hawkins, book* 2, *ch.* 46, *sect.* 36, says, a confession obtained by the flattery of hope or the impression of fear, is not admissible evidence. In *Rex* v. *Woodcock, Leach* 4th edition 500, *Chief Baron Eyre* admitted declarations of a deceased person, and left it to the jury to consider, whether the deceased was not in fact under the apprehension of death, though she did not seem to expect immediate dissolution; and said if they were of opinion she was, the declarations were admissible, and, if of a contrary opinion, they were inadmissible. In *Rex* v. *Hucks,* 1 *Starkie, N. P.* 521, *Chief Justice Ellenborough* said, that upon a question proposed to the judges there, by the judges in Ireland, who entertained doubts on the subject, they were unanimously of opinion, that when a declaration had been made by a party in *articulo mortis,* whether under all the surrounding circumstances the declaration was admissible in evidence, was a question exclusively for the consideration of the court. In the cases, in the Mayor's Court of New York, above mentioned, the question of fact was submitted to the jury. In *Aaron's case,* 1 *South.* 240, *Chief Justice Kirkpatrtck* said, " If the confession, however, rested upon the ground of hope and fear alone, doubtful as it might be, I should have been inclined to yield to its competency, and to leave it to the discretion and judgment of the jury." In many cases, both in this state and in our neighboring states, courts have wholly rejected confessions, when clear and unequivocal evidence of undue influence was discerned. It is unnecessary however, for the sake of the present case, further to pursue this subject, for if the decision should be

made by the court, such decision was made; and if proper for the jury, it was submitted to them, in the most free and unbiased manner. Of the opinion of both court and jury, on this point then, the prisoner enjoyed the advantage.

We are now to examine, under the request of the Court of Oyer and Terminer, whether the evidence in the case was sufficient, in legal contemplation, to warrant the conviction of the prisoner.

In the first place, it is insisted by his counsel, that a verdict ought never to be founded on naked and uncorroborated confessions; and to support this position, they have in a great measure relied on the opinion expressed by *Justice Rossell* in *Aaron's case*, 1 *South.* 242, " that no person indicted for a capital offence shall be convicted on his own confession, without a single circumstance to corroborate it." If the learned judge is to be understood to mean, when the *corpus delicti* is not otherwise proved, as when in larceny no proof is given of the taking of the goods, or in murder, the fact of the death is in no wise shown, and when the whole case depends on the mere confession of the accused, a number of cases will be found to support the doctrine. But if he is to be understood, that even when the *corpus delicti* is otherwise established, the confession of the prisoner alone is not sufficient, if the jury believe it to be true, to produce a conviction, the opinion stands opposed to very high authority. The only case referred to by the judge, is from *Leach's crown law* 320, Alexander Fisher's case. This citation was evidently made from the first edition of *Leach*, and *Justice Heath*, on a trial at the assizes, is there reported to have laid down the rule in substance as above stated. But Fisher's case was mis-reported by *Leach* in that edition, and is one of the many errors, which he says in the preface of his subsequent editions, that he has corrected. In the 4th edition published in 1815, vol. 1, page 311, the same case is to be found, and the point decided, as there reported, is wholly different. " There was no other evidence," says

the Reporter, " to fix these facts upon the prisoner, than his
confession made on his examination before the committing
magistrate, and there being no evidence, that this confession
was not reduced into writing, *viva voce* testimony of it was
rejected." In the same page, *Leach* reports the case of
John Wheeling, tried before *Lord Kenyon,* at the summer
assizes at Salisbury, 1789, in which it was determined that
" a prisoner may be convicted on his own confession, when
proved by legal testimony, although it is totally uncorrobo-
rated by any other evidence."

*Hawkins,* book 2, *ch.* 46, *s.* 36, says, " If a confession be
voluntarily made, and regularly proved on the trial, it is
sufficient if the jury believe it to be true, to convict the
prisoner, without any corroborating evidence to support it."
*Phillips* in his treatise on evidence, says, " a free and volun-
tary confession, made by a prisoner to any person at any
time or place, is strong evidence against him, and, if satis-
factorily proved, sufficient to convict, without any corrobo-
rating circumstance." 1 *Phil. Ev.* 81. And afterwards he
says, " It appears now to be an established rule, that a full
and voluntary confession by the prisoner of the overt acts,
charged against him on indictment for treason, is of itself
sufficient evidence to warrant a conviction." *Ibid.* 85.
*Starkie* says, a " prisoner may be convicted on his own
confession without other evidence." *Starkie Evid.* part 4,
page 53. An opinion on this point need not however,
be here expressed, nor need the enquiry be further prose-
cuted, for it will, I think, be demonstrated, in the sequel,
that the confessions are " strong and pregnant," " disclos-
ing and bringing forth facts and circumstances," and that
there are circumstances corroborating these confessions
of a peculiarly pointed and persuasive character. In the
first place, however, it becomes material to a correct under-
standing of the subject, to settle what is meant by the
qualification, " corroborating," annexed to the term " cir-
cumstances." The phrase clearly does not mean facts

which, independent of the confession, will warrant a conviction, for then the verdict would stand not on the confession but upon those independent circumstances. To corroborate is to strengthen, to confirm by additional security, to add strength. The testimony of a witness, is said to be corroborated, when it is shewn to correspond with the representation of some other witness, or to comport with some facts otherwise known or established. Corroborating circumstances then, used in reference to a confession, are such as serve to strengthen it, to render it more probable, such in short as may serve to impress a jury with a belief of its truth. In this view of the subject, the evidence in this cause affords circumstances corroborating, in a singular and remarkable manner, the confessions which were proved. I shall briefly state them. The prisoner said, he went to the house of the deceased, for the purpose of borrowing a gun. It was proved a gun had been kept there, and that the prisoner knew it. He said she refused him the gun, and accused him of having done mischief to her pig and pigeons. It was proved that she had entertained a belief that such mischief had been done by him. He confessed he had struck her with a yoke. The witness, who first saw her after the disaster, testified that he found the yoke and blood on it lying near her. The prisoner confessed that, as he was going out, after she had refused his request, he saw the yoke *by the door*, picked it up and went back. Jonathan Vankirk, who resided in the house, testified to the jury that when he went out about noon to work, the yoke was by the side of the door. The prisoner stated that she was on the hearth. M'Coy, the first who saw her, found her lying in the corner of the fire place. He stated that she was starching a cap. A cap, says M'Coy, lay on the hearth by the side of her. To Philip Knowles he related the story, and confessed he struck her a first, second, third and fourth time. M'Coy testified there were four wounds—one on the top of her head, one on the right

temple, one on the right eye, and one on the under jaw. The minute detail of incidents and the steady uniformity of his relations to a number of persons, are not among the least striking of the circumstances which mark these confessions. One supposed discrepancy only has been observed or pointed out. To one of the witnesses he said, the deceased was sitting by the fire, blowing the fire. To another, that she was starching a cap and stooping down on the hearth. No difficulty however, seems to exist in reconciling these representations by supposing that he spoke of different points of time.

In this view of the case, a most marked difference from that of Aaron, on which the prisoner's counsel placed much reliance, cannot escape observation. No attending circumstance stated by him was proved to have existed; and although before the coroner's inquest, and for three or four weeks after he was put in gaol, he continued to make the confessions, yet afterwards, and until the time of trial, he steadily denied the truth of what he had confessed.

In the charge to the jury the court say, " there are some coincidences between the facts detailed in his confession and the real state of things, as testified by other witnesses; these would be strong proofs of guilt, if he could not have learned them from any other means, except by having gone to the house and seen the body and other things as they really were. But his confessions were made long after, there were other sources of information, and if you think it probable, or possible, that it was furnished from other sources, the evidence arising out of these coincidences will have but little weight." In this passage, as well as in every other part of a very judicious charge, we see the cautious and humane intentions of the judge, that on so deeply important an occasion, no proper consideration should be overlooked by the jury, and that every thing which might justly have weight *in favorem vitæ* should be presented to their view. These considerations were earnestly urged

State *v.* Guild

before us by the prisoner's counsel. But that a youth, like
the prisoner, should carefully treasure up from time to time
the fragments of information which he might have heard;
that he should weave them together into a connected and
consistent tale; that he should uniformly and repeatedly
relate them, and in the same manner, and all this, not as an
avowal or argument of innocence, but as a declaration of
atrocious guilt, was, in our opinion, very properly considered
by the jury to be beyond all reasonable bounds of credibility.
And it could not have escaped their observation, that in no
particular, not even the slightest, was his confession contra-
dicted, or found inconsistent with the  acts or in any wise
disproved.

The age of the prisoner was earnestly pressed on our con-
sideration by his counsel, who strenuously insisted he was
too young to be exposed to punishment on such evidence.
At the perpetration of the offence he was aged twelve years
and somewhat more than five months. The sound, sensible
and legal rule on this head is, in our opinion, judiciously, as
well as lucidly, stated by *Justice Southard* in the case of
Aaron. "This capacity," says he, "to commit a crime,
necessarily supposes the capacity to confess it. He who is
a rational and moral agent, and can merit the infliction of
legal sanctions, must be able to detail his motives and acts,
and must be judged by them. If therefore the defendant
was of an age to be punished, he was of an age to confess
his guilt." These principles are conformable to the most
approved and respected authorities. In *Leach's Edition of
Hawkins, B.* 1, *C.* 1, *page* 1, *in note*, it is said, "from this
supposed imbecility of mind, the protective humanity of the
law will not, without anxious circumspection, permit an
infant to be convicted on his own confession. Yet if it
appear, by strong and pregnant evidence and circumstances;
that he was perfectly conscious of the nature and malignity
of the crime, the verdict of a jury may find him guilty and
judgment of death be given against him." *Blackstone* says,

" in very modern times, a boy of ten years old was convicted on his own confession, of murdering his bed fellow, there appearing in his whole behavior plain tokens of a mischievous discretion, and as sparing this boy merely on account of his tender years, might be of dangerous consequence to the public by propagating a notion that children might commit such atrocious crimes, with impunity, it was unanimously agreed by all the judges that he was a proper subject of capital punishment." 4 *Bl. Com.* 23. The case mentioned by *Blackstone* is reported at large by *Foster*. The evidence was the confession of the boy, with some circumstances tending to corroborate the confession, but in one respect widely different from the present case, for one, and a leading circumstance, which he stated was found to be entirely untrue. *York's case, Foster* 70.

In regard to a youth of the years of the prisoner, the law most wisely requires the utmost circumspection from the jurors; and it is satisfactory to find that in the present case the jury were distinctly reminded of their duty. " This fact," says the judge in his charge, " should make you more cautious in admitting the confessions and induce you to resolve your doubts in his favor."

.Under a deep sense of responsibility, after a careful deliberation, and feeling the strongest impression of the tenderness due to the life of a fellow creature, we hold ourselves bound to advise the Court of Oyer and Terminer not to grant a new trial, but to proceed to discharge the solemn duty which remains to them, by pronouncing the sentence of the law on the crime of murder.

The prisoner was sentenced and executed.